**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Huber and Sons, Inc., Paul Huber, and Lisa Huber,

Plaintiffs,

v.

Service Corporation International,

Defendant.

Civ. No. 01-1583 (RHK/JSM)

**MEMORANDUM OPINION AND ORDER**

---

Michael D. Schwartz and Travis D. Stottler, Schwartz, Stottler & Dean, P.A., Chanhassen, Minnesota, and Andrew S. Birrell, Birrell & Newmark, Minneapolis, Minnesota, for Plaintiffs.

Steven E. Rau and Andrew J. Noel, Flynn, Gaskins & Bennett, L.L.P., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Plaintiffs Paul and Lisa Huber own or lease parcels of real estate in the Twin Cities that they, in turn, lease to Plaintiff Huber and Sons, Inc., a Minnesota corporation that does business as "Huber Funeral Homes." Defendant Service Corporation International ("SCI") operates funeral homes, cemeteries, and crematoria around the country. Beginning in 1994, SCI began to discuss with the Hubers the possibility of purchasing the Huber Funeral Homes business. On November 6, 1998, the parties signed a Letter of Intent that is the subject of this litigation.

On February 17, 1999, SCI sent a letter to the Hubers terminating the Letter of Intent. The parties never closed on the sale of the Huber Funeral Homes. Plaintiffs

MAR 1 3 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAR 1 3 2003
DEPUTY CLERK

thereafter sued SCI, alleging that SCI breached an express or implied contract to purchase the Huber Funeral Homes. Plaintiffs also assert claims of promissory estoppel and equitable estoppel.

Presently before the Court is SCI's motion for summary judgment on the breach of contract, promissory estoppel and equitable estoppel claims. For the reasons set forth below, the Court will grant the motion.

**Background**

In 1994, SCI first contacted the Hubers regarding their willingness to sell the Huber Funeral Homes business. (Rau Aff. Ex. C at 29 (Dep. of Paul Huber).) At that time, the Hubers were not interested. (Id.) The parties did not begin to negotiate in earnest regarding SCI's purchase of Huber Funeral Homes until 1998.

In late September, Paul Huber sent a letter to SCI indicating that they were interested in taking the next step in the negotiation of SCI's acquisition of Huber Funeral Homes. (Rau Aff. Ex. D.) Huber acknowledged that "the next step" would be for the parties to sign a letter of intent. (Id.) Huber indicated his understanding that the letter of intent "would be non-binding on either side except for an Agreement on our part not to sell to someone else for a period of ninety days and for reasonable efforts by everyone to reach a Definitive Agreement." (Id.; see also Rau Aff. Ex. C at 37.)

On October 2, 1998, SCI sent to the Hubers and their attorney, Michael Schwartz, a draft letter of intent for their review. (Rau Aff. Ex. E.) The draft letter stated at the

outset that "[e]xcept as specifically set forth herein, this Letter of Intent shall not constitute an agreement between the parties and no agreement shall be deemed to exist until execution of a definitive agreement." (Id. at second page.) Summarizing the basic points of the transaction that had been proposed, the October 2 draft also stated that the transaction was conditioned upon four things:

> 1. The parties having entered into definitive agreements;
>
> 2. There being no material adverse change in the financial conditions, physical condition or operations of Huber Funeral Homes or the real estate, and no dividends, other distributions to shareholders or redemptions by Huber Funeral Homes from December 31, 1997 to the date of closing;
>
> 3. Additional due diligence, as SCI deemed necessary; and
>
> 4. Approval by the Executive Committee of SCI's Board of Directors.

(Id. at third page.) The October 2 draft next stated that three paragraphs would constitute "legally binding and enforceable agreements of Buyer and Seller." (Id. at fourth page.) Those agreements would take effect upon the execution of the letter of intent and would remain "in effect for a term of 90 days from the date set out below and shall continue thereafter until terminated by either party following 15 days' prior written notice." (Id.) Immediately following the three "legally binding and enforceable agreements," the letter concluded: "AGREED TO AND ACCEPTED THIS ____ DAY OF OCTOBER, 1998." (Id. at fifth page.)

The Hubers' attorney responded to the October 2 draft letter four weeks later with a five-page letter proposing several changes. The Hubers' attorney specifically addressed

the binding nature of the Letter of Intent as follows:

> 2. The Letter of Intent actually does constitute an agreement between the parties. The agreement includes the prohibition on the part of the Hubers from seeking other buyers, requires both Buyer and Seller to use reasonable efforts and to negotiate in good faith towards a definitive agreement and requires both parties to maintain the confidentiality of the negotiations and the proposed transaction. Accordingly, the language of the Letter of Intent should reflect that to a limited extent it is an agreement between the parties.
>
> Of course, the Letter of Intent is not a definitive agreement binding either SCI to buy or the Hubers to sell and I certainly agree that the Letter of Intent should clearly provide that the obligation to buy and/or the obligation to sell will only come into existence upon the execution of a definitive agreement.

(Rau Aff. Ex. F at 2 (emphasis in original).) The Hubers' counsel also offered substantive comments on the paragraphs that were to constitute "legally binding and enforceable agreements" between SCI and the Hubers, including a request that a paragraph be added that would read as follows:

> The closing will take place no earlier than 60 days from execution of the Letter of Intent and no later than 180 days from the execution of the Letter of Intent or no later than 90 days from the execution of the definitive agreements, whichever is earlier.

(Id. at 4.)

After further revisions and discussions between counsel for the Hubers and for SCI, the parties executed a Letter of Intent on November 6, 1998. (Rau Aff. Ex. H.) Most of the language quoted above from the October 2 draft remained unchanged. (Compare id. with Ex. E.) The parties added, however, a paragraph to the "legally

binding and enforceable agreements" at the end of the letter providing that "[t]he closing will take place no earlier than 50 days from execution of this Letter of Intent and no later than the earlier of 180 days from execution of this Letter of Intent or 90 days from execution of the definitive agreements." (Rau Aff. Ex. H at 2.)

One week after the parties signed the November 6 Letter of Intent, an in-house attorney for SCI wrote to the Hubers' attorney, Schwartz, indicating that SCI would be sending to Schwartz a draft acquisition agreement and related documents by November 25. (Rau Aff. Ex. M.) To expedite the process of finalizing the transaction, SCI's counsel sent certain schedules to be completed by the Hubers regarding the Huber Funeral Homes business; those schedules would become part of the Purchase Agreement. (Id.) SCI's counsel asked Schwartz to provide the schedule information to SCI no later than fifteen days before the closing. (Id.)

On November 23, 1998, counsel for SCI sent Schwartz drafts of the following documents: a Purchase Agreement, a non-compete agreement, employment agreements for Paul and Lisa Huber, and a lease agreement. (Rau Aff. Ex. J.) SCI's counsel asked Schwartz to review the draft agreements with his clients and pass on whatever questions or comments he had at his earliest convenience. (Id.) SCI's counsel also asked Schwartz for the schedules referenced in the Purchase Agreement. (Id.)

On December 15, counsel for SCI wrote to Schwartz confirming that the Executive Committee had not yet approved the transaction regarding the Huber Funeral Homes.

(Rau Aff. Ex. N.) SCI's counsel stated that he saw no reason to believe that the Executive Committee would not approve the transaction and that he hoped Schwartz and the Hubers would "feel comfortable enough that you can go ahead and review the documentation that we sent you a couple of weeks ago. We would certainly appreciate having your comments and/or questions as soon as you might be able to provide them to us, so that the transaction can proceed as reasonably promptly as possible." (Id.)

On December 21, SCI sent a letter to Paul Huber and Schwartz confirming that the proposed acquisition of Huber Funeral Homes would be presented to the Executive Committee for approval on or before January 13, 1999. (Rau Aff. Ex. O.) In the event the Board did not approve the transaction, SCI would pay for "(i) all expenses associated with the real estate surveys, title policies, Phase I environmental surveys and building inspections; and (ii) all of [the Hubers'] reasonable attorney fees incurred from and after this date related to the proposed transaction." (Id.) SCI indicated its hope that the Hubers would "rely on this agreement in directing your counsel to proceed with reviewing our proposed Agreements and otherwise proceeding with preparing for closing of the transaction." (Id.)

By a facsimile sent to Schwartz on January 19, 1999, SCI's counsel confirmed that SCI's Executive Committee had approved the transaction and was very much ready to proceed: "It is, however, difficult to go too far toward that goal without knowing what comments, if any, you have to the Agreements which I previously sent you for review.

Please get back to me as to those so we can move forward." (Rau Aff. Ex. Q.) SCI's counsel also reminded Schwartz in that facsimile that SCI had not received any of the schedule information requested in mid-November. (Id.) Schwartz responded that he would be meeting with the Hubers on January 27th and expected to be able to forward comments on the agreements and the information for the schedules within the next ten days. (Rau Aff. Ex. R.)

On February 8, 1999, SCI's counsel sent Schwartz a draft employment agreement for the Hubers' manager, Wally Gelecynskyj. (Rau Aff. Ex. L.) SCI's counsel closed that letter by stating that he was still awaiting Schwartz's comments to the other draft agreements and would appreciate those as soon as possible. (Id.)

On about February 11, 1999, Schwartz spoke to SCI's counsel by telephone. (Schwartz Aff. Ex. C at 28 (Schwartz Dep.).) Schwartz remembered

> telling him I didn't know whether Wally would be having a separate counsel or not. I remember discussing that whether Wally, who was one of the funeral directors there, was agreeable to an employment agreement or not. That as far as the Hubers were concerned and SCI was concerned, it wasn't a big issue. They wanted to make him the offer. If he accepted it, fine, and if he didn't, fine. I remember reminding him that my name was not Mark. And the agreements were fine. And the information on the purchase agreement blanks, we went over that again.

(Id. at 28-29.) According to Schwartz, the draft Purchase Agreement, non-compete agreement, employment agreements for Paul and Lisa Huber, and lease agreement presented no issues because "[t]hose documents were the by-product of SCI doing hundreds of transactions. They were intended to be reasonable. They were reasonable."

(Id. at 30.) The Hubers never signed the agreements SCI drafted, nor is there any correspondence showing that either the Hubers or Schwartz sent SCI completed schedules.

On February 17, 1999, SCI sent a letter to the Hubers, care of Schwartz, stating the following:

> Pursuant to the Letter of Intent ("Letter") dated November 2, 1998 and executed on November 6, 1998 between Paul Huber and Service Corporation International, this shall constitute 15 days' prior written notice of termination of the Letter, effective March 4, 1999. Notwithstanding such 15 day period, you may consider yourselves currently free of the "no-shop" restrictions of the Letter.

(Rau Aff. Ex. S.) SCI later sent the Hubers a check for approximately $15,000, which represented accounting fees, attorney's fees and lost escrow paid by the Hubers. (Rau Aff. Ex. T.) In the letter accompanying the check, SCI stated that it shared the Hubers' disappointment in not having finalized the proposed transaction, "[h]owever, the funeral industry was changing so rapidly around us, we were forced to withdraw our offer." (Id.)

## Analysis

### I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire &

Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Furthermore, it is not enough for the nonmovant to point to some alleged factual dispute between the parties. Any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

In response to SCI's motion for summary judgment, Plaintiffs have submitted approximately 450 pages of deposition testimony – the entire transcripts of seven depositions. In their opposition brief, Plaintiffs cite to only a handful of brief passages from three of these depositions.[1] Four of the depositions are never cited in Plaintiffs'

---

[1] Three of those six citations purportedly support one factual assertion in the opposition brief: that "all of the schedule information had been provided" to SCI. The excerpts cited from Paul Huber's and Michael Schwartz's depositions do not support that assertion at all and Lisa Huber testified only that she believed that the schedule information had been provided to SCI.

memorandum at all. Furthermore, despite having filed seven deposition transcripts with the Court, Plaintiffs offer no evidence to support several factual assertions made in their opposition memorandum, including the following:

- The Hubers turned down at least three offers from other interested parties. (See Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. at 3, 18.)
- SCI backed out of the deal "on the eve of closing." (Id. at 6, 14, 17.)
- Each of the five conditions precedent listed in the Letter of Intent had been satisfied. (Id. at 11-12.)
- The confidentiality provision of the Letter of Intent remained in full force and effect. (Id. at 12.)
- The parties agreed that the execution of the Purchase Agreement, non-compete agreement, lease agreement and employment agreements would be executed contemporaneously at the closing. (Id. at 13, 18.)

The Court refuses to read all seven depositions in a hunt for evidence that supports the above factual assertions or, more generally, to search for evidence giving rise to genuine issues of material fact. As a federal appellate court has wisely observed:

> [I]t is foolhardy for counsel to rely on a court to find disputed issues of material fact not highlighted by counsel's paperwork . . . . [P]ractical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting. Judges are not ferrets!

Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc., 695 F.2d 839, 846-47 (5th Cir. 1983); see also Northwestern Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th

Cir. 1994) (Easterbrook. J.) ("District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits – not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs"). This Court will not do counsel's work for them, nor will it hear Plaintiffs later complain that the Court failed to uncover evidence giving rise to genuine issues of material fact. With that admonition, the Court turns to SCI's motion with respect to the breach of contract claim.

## II. Breach of Contract

There is no dispute that the alleged "contract" at issue here is the November 6, 1998 Letter of Intent. Plaintiffs claim that SCI breached the Letter of Intent "by failing to act in good faith and execute the agreed-upon definitive agreements within the required time period." (Pl.'s Mem. Opp'n to Def.'s Mot. for Summ. J. at 5.) SCI argues that Plaintiffs' breach of contract claim fails for two reasons. It first contends that the Letter of Intent is not an enforceable contract, asserting that merely because the parties call something a binding and enforceable agreement does not make it so. SCI relies on the Eighth Circuit's recent decision in Richie Company, LLP v. Lyndon Insurance Group, Inc., 316 F.3d 758 (8th Cir. 2003), as support for its first argument that no enforceable contract exists.

In Richie, the Eighth Circuit affirmed the district court's dismissal of the plaintiff's

breach of contract lawsuit on the grounds that the letter of agreement between the parties was an unenforceable "agreement to agree" rather than an enforceable contract under Minnesota law. 316 F.3d at 759. The court of appeals observed that Minnesota courts have refused to enforce an individual provision in a letter of intent as a freestanding "contract" promise *where the parties have agreed that the letter of intent, in its entirety, is not a binding legal agreement.* See id. at 761 (citing Huber and Sons Inc. v. Service Corp. Int'l, 2002 WL 1338036 (D. Minn. June 17, 2002) (Kyle, J.)). The letter at issue in Richie "spoke of future actions and agreements contemplated but not yet completed by the parties, and showed that the letter 'was not the complete and final agreement the parties contemplated would govern' but 'merely created an agreement to negotiate in good faith.'" Id. at 762.

Richie does not warrant the dismissal of Plaintiffs' breach of contract claim in this case. In determining whether a contract exists, the parties' "outward manifestation of assent is determinative, rather than a party's subjective intention." Speckel by Speckel v. Perkins, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985), cited in A.A. Metcalf Moving & Storage Co., Inc. v. North St. Paul-Maplewood Oakdale Schs., 587 N.W.2d 311, 317 (Minn. Ct. App. 1998); see also Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively."). Here, the parties explicitly manifested their intent to have certain portions of the Letter of Intent constitute "legally binding and enforceable

agreements." Thus, Plaintiffs and SCI never agreed that the Letter of Intent, *in its entirety*, would not be a binding legal agreement. To construe the Letter otherwise, as SCI urges, would ignore the objective manifestations of the parties' mutual assent.

The Letter of Intent, therefore, contains enforceable agreements between the parties. That determination alone, however, does not resolve the motion before the Court. SCI also argues that any enforceable agreements in the Letter of Intent only existed and were enforceable for a period of time and were subject to a right of termination. It is undisputed that the Letter of Intent explicitly states that the four "legally binding and enforceable agreements" take effect upon the execution of the Letter and remain "in effect for a term of 90 days from the date set out below and shall continue thereafter until terminated by either party following 15 days prior written notice." Plaintiffs argue that the phrase "the date set out below" means the closing date, not the date on which the agreement was signed. Plaintiffs contend that SCI could not terminate the agreements in the Letter of Intent prior to the closing and, by refusing to close on the transaction, was in "material breach."

Plaintiffs' proposed interpretation of the termination provision is unreasonable. The construction and effect of a contract is a question of law. Brookfield Trade Center, Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). The Court must read contract terms in the context of the entire contract, must not construe the terms so as to lead to a harsh and absurd result, and must interpret the contract in such a way as to give

meaning to all of its provisions. Id. Accepting Plaintiffs' proposed construction would lead to an absurd result and effectively read the parties' mutual right to terminate the obligations out of the contract. Under Plaintiffs' view, SCI would not be able to terminate the obligation regarding the holding of a closing (and Plaintiffs would be unable to terminate the obligation that it not shop for other offers) until after a closing had taken place. At that point, however, the "legally binding and enforceable agreements" would become moot because the deal had closed. The only reasonable interpretation of "the date set out below" is that it means the date on which the Letter of Intent was signed.

It is undisputed that SCI provided fifteen days' written notice of its decision to terminate the Letter of Intent. The record thus undisputedly establishes that any and all legally enforceable obligations under the Letter of Intent terminated as of March 4, 1999, which was more than ninety days but less than 180 days after the parties signed the Letter of Intent. SCI had the right to terminate the agreements as it did. These facts are fatal to Plaintiffs' breach of contract claim. Accordingly the Court grants summary judgment on Plaintiffs' breach of contract claim, Count III of the Amended Complaint.[2]

## III. Promissory Estoppel and Equitable Estoppel

As an alternative to their breach of contract claim, the Plaintiffs also assert claims of promissory estoppel and equitable estoppel. "Promissory estoppel is an equitable

---

[2] The Court finds no merit in Plaintiffs' contention that an "implied" contract existed obligating SCI to close on the transaction. Plaintiffs advanced that argument in the alternative to the existence of an express contract.

doctrine that 'impl[ies] a contract in law where none exists in fact.'" Martens v. Minnesota Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000) (quoting Grouse v. Group Health Plan, Inc., 306 N.W.2d 114, 116 (Minn. 1981)); see also Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (Minn. 1995) (same). Equitable estoppel is similarly a doctrine designed to enforce a promise where no contract in law exists. Having determined that a contract did in fact exist under Minnesota law (see, supra, pages 12-13), the estoppel theories are not available to Plaintiffs as grounds for recovery. See Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 881 (Minn. Ct. App. 1995) (holding that equitable doctrine of promissory estoppel only applies where no contract exists) (citing Sacred Heart Farmers Coop. Elevator v. Johnson, 232 N.W.2d 921, 923 n.1 (Minn. 1975)). Accordingly, Counts IV and V of the Amended Complaint will be dismissed.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that the Defendant's Motion for Summary Judgment (Doc. No. 30) is **GRANTED**. Plaintiffs' Amended Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 13, 2003

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*